**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Chapter 11 |
| Debtors. | Case No. 12-12020 (MG) |
| | |
| OCWEN LOAN SERVICING, LLC, | Adv. Proc. No. 14-02388 (MG) |
| Plaintiff, | |
| v. | |
| THE RESCAP LIQUIDATING TRUST, a Delaware Statutory Trust, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**

*A P P E A R A N C E S:*

HUNTON & WILLIAMS LLP
*Attorneys for Ocwen Loan Servicing, LLC*
200 Park Avenue, 52nd Floor
New York, New York 10166-0136
By:     Joseph J. Saltarelli, Esq.
        Patrick L. Robson, Esq.

MORRISON & FOERSTER LLP
*Attorneys for ResCap Liquidating Trust*
250 West 55th Street
New York, New York 10019
By:     Jamie A Levitt, Esq.
        Todd M. Goren, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are cross-motions for summary judgment (the "Motions") filed in the above-captioned adversary proceeding (the "Adversary Proceeding") and with respect to an administrative expense claim filed against the debtors (the "Debtors") in the above-captioned chapter 11 proceedings. The Adversary Proceeding and administrative claim arise out of Plaintiff Ocwen Loan Servicing, LLC's ("Ocwen") purchase of Debtor Residential Capital, LLC's ("ResCap") mortgage loan servicing platform and loan servicing rights. ResCap's loan servicing business was large and complex. The successful sale of the business as a going concern required a smooth transition that could not be accomplished overnight. Ocwen purchased the rights to service most but not all loans previously serviced by the Debtors. This transaction was an integral part of the Debtors' eventually confirmed chapter 11 plan of liquidation and is memorialized in several writings signed by Ocwen and ResCap. At least four written documents between Ocwen and ResCap allocate rights, responsibilities, and, most important for present purposes, who pays or is supposed to pay for certain services, costs, and expenses. The parties agree that New York law controls the interpretation of their agreement.

The parties' dispute centers on alleged breaches of the parties' agreement. They disagree about who bears third-party vendor costs for storage, segregation, removal, repackaging, and relocation of the mortgage loan servicing files.[1] This is no trifling issue—as much as $11 million as an administrative expense may be at stake; this would result in a potentially big hit for prepetition creditor distributions. The servicing files stored at some third-party vendors are commingled; some loan servicing files were acquired by Ocwen, while some loan servicing files were retained by ResCap (and now the ResCap Liquidating Trust (the "Trust") as one of the

---

[1]     For purposes of this Opinion, the Court refers to the segregation, removal, repackaging, and relocation services as "Segregation and Delivery."

Debtors' successors in interest) and/or its parent company, but all of the files in certain vendor locations are stored together and have yet to be completely segregated. Together, the commingled files continue to incur large monthly storage charges. Ocwen contends that its files should be segregated at the Trust's expense, and delivered to Ocwen, cutting off continued storage charges.

The Motions[2] raise the following issues: (1) which contract provision(s) governs who bears the costs of the Segregation and Delivery of the servicing files; (2) whether, if Ocwen's choice of contract provision(s) controls, there is a condition precedent that Ocwen failed to satisfy before it can claim the right to payment or reimbursement for storage and/or Segregation and Delivery of the loan files; and (3) to what extent does Ocwen bear the burden of vendor storage costs.

For the reasons explained below, the Court **GRANTS** the Plaintiff's Motion in part and **DENIES** it in part, and **DENIES** the Defendant's Motion in its entirety. First, Ocwen is correct that section V.1 of the Statement of Work for Records Management Services (the "RM SOW," SUF Ex. D) governs the Segregation and Delivery of the servicing files acquired by Ocwen and requires that ResCap, and now the Trust, bear the Segregation and Delivery costs under certain circumstances. Second, the Court does not decide whether section V.1 imposes a condition precedent upon Ocwen. On the one hand, the Trust cannot rely on Ocwen's failure to satisfy the

---

[2]        The parties Motion submissions include: (1) Ocwen's motion for summary judgment (the "Plaintiff's Motion" or "Plf.'s Motion," Adv. Proc. No. 14-02388, ECF Doc. # 7, Case No. 12-12020, ECF Doc. # 8130-1), the Trust's opposition (the "Defendant's Opposition" or "Def.'s Opp.," Adv. Proc. No. 14-02388, ECF Doc. # 10, Case No. 12-12020, ECF Doc. # 8309), and Ocwen's reply (the "Plaintiff's Reply" or "Plf.'s Reply," Adv. Proc. No. 14-02388, ECF Doc. # 12, Case No. 12-12020, ECF Doc. # 8425); and (2) the Trust's motion for summary judgment (the "Defendant's Motion" or "Def.'s Motion," Adv. Proc. No. 14-02388, ECF Doc. # 8, Case No. 12-12020, ECF Doc. # 8131), Ocwen's opposition (the "Plaintiff's Opposition" or "Plf.'s Opp.," Adv. Proc. No. 14-02388, ECF Doc. # 9, Case No. 12-12020, ECF Doc. # 8308), and the Trust's reply (the "Defendant's Reply" or "Def.'s Reply," Adv. Proc. No. 14-02388, ECF Doc. # 11, Case No. 12-12020, ECF Doc. # 8424). In support of both of the Motions, the parties submitted a joint statement of undisputed facts (the "SUF," Adv. Proc. No. 14-02388, ECF Doc. # 7-2, Case No. 12-12020, ECF Doc. # 8130-2).

purported condition precedent because ResCap clearly frustrated Ocwen's attempted

satisfaction—at least with respect to the directed Segregation and Delivery of certain files stored

at Iron Mountain.  On the other hand, there are disputed issues of fact and law whether ResCap's

breach of section V.1 of the RM SOW is material and/or constitutes a repudiation such that

Ocwen would be excused from satisfying a condition precedent as to other servicing files.  Third,

ResCap (and now the Trust) must bear the storage costs for the servicing files that ResCap and/or

its parent company retain, but the amount of those charges is not established by the summary

judgment record.  Fourth, Ocwen must bear the storage costs for the servicing files that Ocwen

acquired at least for some period of time.  Though Ocwen argues that if ResCap had not

breached the agreement, Ocwen's files would have been transferred from third-party storage

many months ago thereby cutting off further storage charges for those files, the summary

judgment record does not permit the Court to resolve this issue either.  Finally, the Court is

unable on the summary judgment record to determine the amount of damages Ocwen is entitled

to recover.  Further proceedings, including discovery if necessary, will be required to resolve the

remaining issues if the parties are unable to resolve them on their own.[3]

## I.        BACKGROUND

### A.        Stipulated Facts

The parties sensibly agreed to resolve the Adversary Proceeding and objection to

Ocwen's administrative expense claim together.  This Court's case management and scheduling

order (the "CMSO," Adv. Proc. No. 14-02388, ECF Doc. # 6) sets forth consolidated procedures

for resolving the Adversary Proceeding and the Trust's objection (the "Claims Objection," Case

No. 12-12020, ECF Doc. # 8129) to Ocwen's two administrative claims (the "Administrative

---

[3]    Ocwen argued that it is entitled to damages.  It also asked for an accounting.  The Court does not resolve
now whether an accounting is an available remedy.

Claims"), which partially relate to certain records management issues also at issue in the Adversary Proceeding. (*See* Case No. 12-12020, ECF Doc. ## 6296–6297.) The CMSO permitted the parties to file the Motions and directed that the Court's "ruling on the [M]otions shall be dispositive of Ocwen's claims in the Adversary Proceeding and that portion of [the Trust's] objection in the main action to that portion of Ocwen's Administrative Claim Dkt. 6297" related to the claims in the Adversary Proceeding. (CMSO at 1–2.) The CMSO also requested that the parties submit a joint statement of undisputed facts, to the extent the parties were able to agree. (*Id.* at 2–3.)

The parties then stipulated to the following facts.

> 1. *The Debtors' Bankruptcy and Ocwen's Purchase of Certain of the Debtors' Assets*

On May 14, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. (SUF ¶ 1.) The Court supervised a competitive bidding process culminating with the Court's approval of Ocwen's purchase of ResCap's mortgage loan servicing platform and certain mortgage servicing rights. (*Id.* ¶ 5.) The purchase and sale were memorialized in the Asset Purchase Agreement (the "APA," *id.* Ex. A), dated November 2, 2012. (SUF ¶ 5; *see also* APA.) Pursuant to the APA, Ocwen acquired substantially all of ResCap's loan servicing operations, including ResCap's books and records relating to the business it acquired, and by taking assignment of numerous related contracts, including agency contracts and servicing agreements under which ResCap previously acted as primary or master servicer for investors, thousands of which are private label securitization trusts. (SUF ¶¶ 5–6.) Upon completion of the transfers and assignments, Ocwen obtained an "active" servicing platform from ResCap and agreed to provide services to the mortgage servicing customers. (*Id.* ¶ 7.) The servicing files (the "Servicing Files") that are the subject of

the parties' dispute were also transferred to Ocwen via the APA and other related agreements. (*Id.* ¶ 8.)  Also as a result of the transaction, ResCap transferred to Ocwen certain employees, infrastructure, and resources that Ocwen needed to carry on ResCap's business.  (*Id.*)  In connection with the sale, the parties negotiated the mechanics for the transfer of the various assets and the provision of certain services and resources to each other for a period of time following the closing of the sale.  (*Id.* ¶ 9.)

The APA is the primary agreement governing the sale of the servicing platform and mortgage servicing rights from ResCap to Ocwen that was consummated on February 15, 2013. (*Id.* ¶ 11 (citing APA).)

Ocwen and ResCap also entered into several ancillary agreements.  (*Id.* ¶ 10.)  The Servicing Transfer Agreement (the "STA," *id.* Ex. B), executed on February 15, 2013, describes how certain aspects of the transfer of the mortgage servicing to Ocwen would occur.  (*Id.* ¶¶ 10, 12.)  The STA provides in pertinent part:

### Section 3.04 Possession of Servicing Loan Files.

On or prior to each Servicing Transfer Date, Sellers shall deliver or cause to be delivered to Purchaser all Servicing Loan Files pertaining to the related Serviced Mortgage Loans subject to the Servicing Agreements and all related servicing records as of such Servicing Transfer Date (to the extent not previously delivered to Purchaser), as provided in this Section 3.04.  To the extent such Servicing Loan Files are physically located in a facility acquired by Purchaser under the APA, transfer of possession of the Servicing Loan Files will be effected by Purchaser's taking possession of such facility.  To the extent such Servicing Loan Files are physically located with a vendor utilized by both Sellers and Purchaser, transfer of possession of the Servicing Loan Files will be effected by the vendor reflecting its possession of such files for the account of Purchaser on its records.  To the extent such Servicing Loan Files are physically located with a vendor of Sellers not utilized by Purchaser as of the Servicing Transfer Date, transfer of possession of the Servicing Loan Files will be effected by (i) Purchaser's accession to a contractual relationship with the

vendor as a result of Purchaser's assumption of Sellers' agreement(s) with the vendor pursuant to the APA, (ii) Purchaser's entering into a separate agreement with the vendor, to the extent that Purchaser is assuming such contract or entering into such separate agreement, or (ii) Sellers' contractual granting of access to and constructive possession by Purchaser of such Servicing Loan Files.   To the extent such Servicing Loan Files and related servicing records are not physically located in a facility acquired by Purchaser under the APA or with a vendor as to which Purchaser has, establishes or assumes a contractual relationship, or as to which Sellers have otherwise contractually granted access to and constructive possession of, Sellers shall deliver such Servicing Loan Files and servicing records to Purchaser in accordance with Purchaser's instructions.

Except to the extent inconsistent with the Applicable Requirements, Sellers may deliver Servicing Loan Files and any other documents required to be delivered to Purchaser under this Agreement by means of electronic data files compatible with Purchaser's computer systems and containing scanned images of such Servicing Loan Files or other documents, it being understood that (i) files accessible through any computer system acquired by Purchaser under the APA shall be deemed compatible with Purchaser's computer systems, and (ii) any Servicing Loan Files imaged on files maintained in an image repository acquired by Purchaser under the APA shall be deemed delivered by virtue of such acquisition.  Any Servicing Loan Files which have not been delivered to Purchaser by the Closing Date and are in the possession or control of any Seller, actually or constructively, shall be delivered to Purchaser or Purchaser's designee in accordance with Purchaser's instructions and shall be held by such Seller in trust for the benefit of Purchaser until delivery to Purchaser or Purchaser's designee.

(STA § 3.04.)

The parties stipulate that the underlined portion of the following clause in section 3.04 was added to the STA on February 6, 2013, in a draft sent from ResCap's counsel to Ocwen's counsel:

To the extent such Servicing Loan Files are physically located with a vendor <u>utilized by both Sellers and Purchaser, transfer of possession of the Servicing Loan Files will be effected by the</u>

<u>vendor reflecting its possession of such files for the account of
Purchaser on its records.</u>

(SUF ¶ 12.)

The STA also includes the following provision:

**Section 5.03 Complete Agreement.**

This Agreement, including the Exhibits and Schedules
hereto and the documents and other writings referred to herein or
therein or delivered pursuant hereto, together with the APA
contains the entire agreement and understanding of the Parties with
respect to its subject matter. There are no restrictions, agreements,
promises, warranties, covenants or undertakings between the
Parties other than those expressly set forth herein or therein. This
Agreement supersedes all prior agreements and understandings
(other than the APA) among the Parties, both written and oral, with
respect to its subject matter.

(STA § 5.03.)

The parties also executed the Transition Services Agreement (the "TSA," *id.* Ex. C) on

February 15, 2013, setting forth services that Ocwen and ResCap would provide each other for a

period of time after consummation of the APA. (*Id.* ¶¶ 10, 13.) The TSA incorporates several

statements of work ("Statements of Work" or "SOWs") that define specific services the parties

will provide and sets prices for those services. (*See* TSA.) The RM SOW covers records

management services. (*See* RM SOW.)

Schedules A-1 and A-2 to the TSA describe the specific services the parties agreed to

provide each other under the TSA and relevant SOW(s). (*See* TSA.) Only two of the services

are addressed in the Motions. "Records Management Storage" is listed as falling within the RM

SOW in Schedule A-1; it is starred as "represent[ing] storage costs reimbursement related to" the

RM SOW (*id.* Sch. A-1); August 31, 2014 is identified as the expected termination date; and it

is listed as a service ResCap would provide to Ocwen (*id.*). "Records Management" is also listed

as falling within the RM SOW, but in Schedule A-2 (*id.* Sch. A-2); February 15, 2016 is identified as the termination date; and it is listed as a service Ocwen would provide to ResCap (*id.*).

Similar to the STA, the TSA also includes the following merger clause:

> 15.4   Entire Agreement.  This Agreement, including the Schedules hereto, which are each hereby incorporated herein and made a part hereof, contains the entire agreement between the Parties with respect to the subject matter hereof.   While purchase orders, invoices or similar routine documents may be used to implement or administer provisions of this Agreement, any provisions of such documents that add to, vary, modify or are at conflict with the provisions of this Agreement will be deemed deleted and will have no force or effect on either Party's rights or obligations.

(*Id.* § 15.4.)

The RM SOW, executed on February 1, 2013 and later incorporated into the TSA, provides for certain assumptions and dependencies amongst the parties.  Section V.1 of the RM SOW provides:

> Within 18 months after the Effective Date, Ocwen shall, at ResCap's cost, direct the appropriate third-party vendor to segregate, remove, repackage and relocate those records belonging to Ocwen from all other records at such record retention site.

(RM SOW § V.1.)

After the Court approved the APA and Ocwen's asset purchase, the Debtors and the Official Committee of Unsecured Creditors filed the *Second Amended Joint Chapter 11 Plan by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Plan," Case No. 12-12020, ECF Doc. # 6030).  The Plan was confirmed on December 11, 2013 (*see* Confirmation Order," Case No. 12-12020, ECF Doc. # 6065), and became effective on December 17, 2013.  The Plan established the Trust as a successor in interest to the Debtors. (SUF ¶ 2 (citing Case No. 12-12020, ECF Doc. # 6137).)

The Plan provided for the treatment of administrative expense claims, setting January 6, 2014 as the bar date for filing such claims. (*Id.* ¶ 3 (citing Plan art. V.A.1).) Parties that entered into contracts and leases with a Debtor after the Petition date were required to file proofs of any post-petition claims and assert such administrative expense claims by the applicable bar date; failure to timely file the claims resulted in the waiver and release of the claims against the Debtors. (*Id.* (citing Plan art. V.L.3).)

The Plan's Confirmation Order states in pertinent part:

> Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Ocwen APA . . . shall vest in the Liquidating Trust in accordance with the Plan and the Ocwen Sale Order. The Liquidating Trust shall assume and perform any and all rights, benefits, duties and obligations of the Debtors under the Ocwen APA and the Ocwen Sale Order in accordance with their terms, and such rights, benefits, duties and obligations shall not be deemed to have been released or discharged by the occurrence of the Effective Date, by any provisions of the Plan (including, but not limited to, the provisions of Article IX of the Plan), or otherwise. Nothing in the Plan Documents or this Confirmation Order shall, or shall be deemed or construed to alter, change, modify or amend the terms and provisions of the Ocwen APA and Ocwen's, the Debtors', and the Liquidating Trust's rights, as applicable, thereunder, which rights shall continue in full force and effect and be enforceable following the Effective Date in accordance with the terms thereof. For the avoidance of doubt, Ocwen shall not be required to file an Administrative Claim to preserve its rights or Claims arising after the Effective Date from or related to the Ocwen APA.

(*Id.* ¶ 4 (quoting confirmation Order ¶ 31).)

### 2.    The Servicing Files Dispute

Before consummation of the APA, ResCap had custody of the Servicing Files and stored them at vendor warehouses, its own facilities, and electronically. (*Id.* ¶ 15.) The majority of the hard copy Servicing Files acquired by Ocwen pursuant to the APA were stored with document storage vendors Iron Mountain and Kenwood (together, the "Vendors"). (*Id.* ¶ 16.) Some of the

Servicing Files acquired by Ocwen under the APA were, and remain today, stored and commingled with servicing files retained by ResCap.  (*Id.*)

As a result of the transaction, Ocwen assumed ResCap's contract with Kenwood.  (*Id.* ¶ 18.)  Both ResCap and Ocwen utilized Iron Mountain as a document storage vendor at the time of the sale, so no assumption was necessary.  (*Id.* ¶ 17.)  Since February 2013, when the APA became effective, ResCap has sent Ocwen monthly invoices in the approximate amount of $110,234, seeking reimbursement for Iron Mountain's storage charges for the Servicing Files acquired by Ocwen.  (*Id.* ¶ 19.)  Ocwen paid ResCap's invoices for storage charges from February 2013 through August 2013, but it has not paid the invoices for September 2013 through the present (except for November 2013).  (*Id.*)

On August 12, 2013, Iron Mountain issued a Statement of Work (the "Iron Mountain SOW," *id.* Ex. E), stating that Ocwen has requested for Iron Mountain to prepare to retrieve trailing documents ("Trailing Documents")[4] currently stored at Iron Mountain, and estimating the total cost to Segregate and Deliver the Trailing Documents requested by Ocwen to be $7,093,932.81.  (*Id.* at 1.)  On September 18, 2013, Iron Mountain informed Ocwen by email that ResCap had "formally requested" that Iron Mountain immediately stop any work being performed under the Iron Mountain SOW.  (*Id.* ¶ 21 (citing *id.* Ex. F).)  The battle lines were being drawn.

In September and October 2013, Ocwen and ResCap exchanged correspondence related to their dispute regarding Segregation and Delivery of the Servicing Files.  (*Id.* ¶ 22 (citing *id.* Ex. G).)  ResCap stated its position that section 3.04 of the STA governed the parties' dispute over the Servicing Files and that Ocwen was obligated to incur any charges for the Segregation

---

[4]        The parties did not stipulate to the definition of Trailing Documents, but the Trust states that trailing documents are generally portions of loan files, rather than entire loan files.  (*See* Def.'s Motion at 4.)

and Delivery of the Servicing Files, "subject to reimbursement from" the Debtors' estates.  (*Id.*

Ex. G (Ltr. dated Sept. 18, 2013 from ResCap's Chief Business Officer, Tammy Hamzehpour at

3–4).)  ResCap acknowledged that it had paid Iron Mountain's fees "to segregate the vastly

fewer servicing loan files being transferred to Walter/Green Tree," another purchaser of

servicing rights from ResCap, and that ResCap had "approved some preliminary activities [by

Iron Mountain] toward a similar exercise with the Ocwen files," but denied that it had "a

contractual obligation . . . to engage Iron Mountain to complete that work or to do anything more

than what is required under the STA."  (*Id.*)  Ocwen responded that under the plain language of

section V.1 of the RM SOW, ResCap was obligated to pay Segregation and Delivery costs

directly to Iron Mountain.  (*Id.* (Ltrs. dated Sept. 20, 2013 and Oct. 14, 2013 from Timothy M.

Hayes, Executive Vice President and General Counsel of Ocwen, to Tammy Hamzehpour of

ResCap).)

### B.       The Relevant Administrative Claim

Ocwen filed two Administrative Claims against ResCap, but only one of the claims (the

"Relevant Administrative Claim," Case No. 12-12020, ECF Doc. # 6297) directly relates to the

Motions in pertinent part.[5]  The Relevant Administrative Claim asserts that under the RM SOW,

"the Debtors are obligated to pay for the organization, segregation and removal of certain

mortgage files acquired by Ocwen from the Sellers," but that  "the Debtors have refused to

authorize third party vendor, Iron Mountain, to initiate this process."  (*Id.* ¶ 12.)  The Relevant

Administrative Claim asserts an administrative priority claim in the amount of $7,093,932.81 on

this basis and a separate administrative claim in the amount of $1,875,791.00 for "work to be

performed by Iron Mountain concerning the origination/servicing file project."  (*Id.*)

---

[5]        The remaining allegations in support of the Relevant Administrative Claim fall outside the scope of these
Motions as they primarily relate to retained liability for litigation pending in state court.  (*See generally id.*)

### C.      The Complaint

On October 24, 2014, Ocwen filed a complaint (the "Complaint," Adv. Proc. No. 14-02388, ECF Doc. # 1) against the Trust commencing the Adversary Proceeding.  The Complaint alleges that on February 1, 2013, pursuant to the TSA, Ocwen and ResCap entered into the RM SOW, under which Ocwen acts as a supplier of records management services, as defined in the RM SOW, to or on behalf of ResCap.  (*Id.* ¶ 9.)  The Complaint alleges that, "upon information and belief," Iron Mountain maintained records of ResCap and records of its parent, Ally Financial, Inc. ("AFI"), and that such records are commingled, rather than segregated by entity. (*Id.* ¶¶ 10–11.)

The Complaint alleges that under the plain terms of section V.1 of the RM SOW, ResCap is obligated to pay for the Segregation and Delivery of records acquired by Ocwen from ResCap pursuant to the APA.  (*Id.* ¶ 13.)  The Complaint further alleges that under sections 6.25[6] and 9.2[7] of the APA, the Trust is liable for any servicing transfer cost in excess of the $10 million

---

[6]      Section 6.25 of the APA states in part:

> Notwithstanding any of the terms of this Agreement, the aggregate amount that Purchaser shall be liable for under the Purchaser Payable Cure Amounts, the Transfer Taxes under section 6.9, the transfer costs under Section 9.2 (except to the extent paid for by Purchaser pursuant to section 6.24) and any other Section specifically referencing the Purchaser Payable Cure Amount shall not in the aggregate exceed $10,000,000 (the "Purchaser Payment Cap") (for the avoidance of doubt, clause (v) of "Assumed Liabilities" and Section 6.24 are not included within the Purchaser Payment Cap), and Sellers shall be liable for any such Cure Amount, Transfer Taxes and transfer costs in excess of the Purchaser Payment Cap.

(APA § 6.25.)

[7]      Section 9.2 of the APA provides:

> **Costs of Transfer.**   Except as otherwise provided herein (including the Purchaser Payment Cap) or in the Servicing Transfer Agreement, Sellers, on the one hand, and Purchaser, on the other hand, shall each be responsible for 50% of all costs and expenses of transferring the Purchased Mortgage Servicing to Purchaser, including (i) transferring the servicer status of any Serviced Mortgage Loan registered on MERS from Sellers to Purchaser, (ii) preparing

purchaser payment cap (the "Purchaser Payment Cap"), as defined in the APA. (*Id.* ¶ 25.) The

Complaint alleges that because Ocwen has already satisfied its allocated obligation relating to

servicing transfer costs, any excess costs, including the Vendors' charges for the Segregation and

Delivery of Ocwen's files, are payable directly by the Trust pursuant to these sections of the

APA. (*Id.*)

The Complaint alleges that in August 2013, ResCap indicated that it would pay the

Vendors' charges for the Segregation and Delivery of those records belonging to Ocwen

pursuant to section V.1 of the RM SOW; ResCap and Iron Mountain then began negotiating the

Iron Mountain SOW for Iron Mountain's services. (*Id.* ¶ 15.) The Complaint also alleges that

while the Iron Mountain SOW was being reviewed and negotiated, ResCap indicated that the

Vendors should begin to perform the Segregation and Delivery of Ocwen's records. (*Id.* ¶ 18.)

The Complaint alleges that on September 18, 2013, without explanation, ResCap

declined to move forward with its obligations under the RM SOW and requested that the

Vendors cease work on Ocwen's records. (*Id.* ¶ 19.) Since that time, ResCap has refused

---

assignments or mortgages and deeds of trust in recordable form to the extent
necessary or advisable for Purchaser to assume servicing responsibility for any
Serviced Mortgaged Loan not registered on MERS (provided that the fees and
expenses of recording assignments, if Purchaser chooses to do so, will be borne
entirely by Purchaser), (iii) preparation and mailing of "hello-goodbye letter" to
Serviced Mortgagors (as defined in the Servicing Transfer Agreement), (iv)
preparation and delivery of notices to Investors, ETS Customers, trustees, bond
insurers, custodians, master servicers, subservicers, vendors, foreclosure
attorneys and other interest parties, (v) retitling custodial, escrow and other
servicing related bank and investment accounts, (vi) obtaining Investor or ETS
Customer consents and rating agency "no downgrade" letters (if and to the
extent required under Orders of the Bankruptcy Court), (vii) obtaining PSA
Amendments, (viii) recording of mortgage assignments, (ix) the cost of tax and
flood contracts and (x) filing pleadings and other documents and instruments
with the court or other appropriate body requesting that Sellers be removed as a
party plaintiff to litigation and substituting Purchaser or another appropriate
party plaintiff, as the real party-in-interest.

(*Id.* § 9.2.)

Ocwen's demand that ResCap pay directly or agree to pay directly the estimated Vendors' charges for the Segregation and Delivery of Ocwen's records.  (*Id.*)

The Complaint alleges that Ocwen has disputed the invoices for storage charges, arguing that if the Trust performed its obligations under the applicable agreements, Ocwen would have acquired direct control over the records, and either scanned and/or maintained them in a manner that would not have required storage by third-party vendors or resulted in the payment of storage fees (*id.* ¶ 21); but for the Trust's breach of its obligations under the applicable agreements, the Trust would not have incurred storage fees for the storage of Ocwen's records, and Ocwen would not be under any purported obligation to reimburse the Trust for the payment of such fees (*id.*). The Complaint also alleges that the invoices include storage fees for the commingled records— those acquired by Ocwen and those retained by the Debtors.  The storage fees that are directly attributable to Ocwen's records alone should be significantly less.[8]  (*Id.* ¶ 22.)

The Complaint alleges "upon information and belief" that ResCap budgeted for the amounts it expected to pay in connection with its obligations under section V.1 of the RM SOW. (*Id.* ¶ 16.)  The Complaint does not allege, and more importantly nothing in the SUF addresses, how much ResCap allegedly budgeted for these services.  Absent proof, this allegation in the Complaint is unsubstantiated.  The Complaint further alleges "upon information and belief" that the estimated total charges for Iron Mountain's services will be approximately $9.1 million, and estimated total charges for Kenwood's services will be approximately $2 million,[9] aggregating to approximately $11.1 million.  (*Id.* ¶ 17.)

---

[8]       The allegations regarding reduced storage charges, either because Ocwen would have removed its loan files earlier if the Trust performed its contractual obligations, or because the storage charges include charges for commingled files, present disputed issues of fact that cannot be resolved on the summary judgment record. Therefore, whether or how much Ocwen's storage charges should be reduced remains undecided.

[9]       The summary judgment record regarding the storage charges and Segregation and Delivery of records stored at Kenwood, is largely uninformative and provides no support for summary judgment.  It is unclear whether

The Complaint asserts a monetary damages claim for breach of contract, citing the APA, STA, TSA, and RM SOW as the relevant contracts that the Trust allegedly breached.  (*Id.* ¶¶ 27–31.)  According to Ocwen, Ocwen has performed its material obligations under the parties' contracts and ResCap's and the Trust's refusal to pay directly or to agree that it will pay directly the Vendors' estimated charges for the Segregation and Delivery of Ocwen's records constitutes a continuing breach of their contractual obligations.  (*Id.* ¶ 29–30.)  Ocwen seeks damages in the approximate amount of $11.2 million.  (*Id.* ¶ 31.)

The Complaint also includes a request for a declaratory judgment that:  (1) pursuant to section V.1 of the RM SOW and sections 6.25 and 9.2 of the APA, the Trust must pay directly the Vendors' charges for the Segregation and Delivery of those mortgage servicing records belonging to Ocwen from all other records at the Vendors' sites; and (2) Ocwen is under no obligation to reimburse the Trust for storage fees incurred and paid by ResCap or the Trust after August 2013, related to the storage of Ocwen's records that, under the applicable agreements, should have been Segregated and Delivered at Ocwen's direction at that time.  (*Id.* ¶¶ 35–36.)

### D.    The Plaintiff's Motion

Ocwen's Motion seeks the entry of a Court order declaring that:  (1) section V.1 of the RM SOW governs the parties' dispute and that the Trust is in breach of its obligations pursuant to this provision; (2) under section V.1 of the RM SOW, the Trust is obligated to bear the cost of the Segregation and Delivery of the Servicing Files from the Vendors; (3) Ocwen is not obligated to reimburse the Trust for any Vendor charges related to the storage of the Servicing Files incurred by ResCap or the Trust beginning in September 2013; and (4) the Trust is obligated to reimburse Ocwen for any Vendor charges related to storage of servicing files

---

the loan files stored at Kenwood include commingled files, as in the case of Iron Mountain; it is also unclear whether Ocwen directed Kenwood to Segregate and Deliver Ocwen's files.

retained by the Trust until such time as those files are transferred.  If complete relief is not granted, Ocwen also requests an order:  (i) granting limited discovery and an accounting to determine the amount of damages owing; and (ii) directing the Trust to reimburse Ocwen for such costs.  (Plf.'s Motion at 14–15.)

Ocwen argues that section V.1 of the RM SOW governs the parties' dispute and requires the Trust to pay the costs of the Segregation and Delivery of the Servicing Files (*id.* at 6–8), and that the language of section V.1 is clear and consistent with the terms of the TSA (*id.* at 6–7).  According to Ocwen, ResCap previously admitted its obligation to cover the relevant costs pursuant to section V.1 and should not be able to backtrack from this prior admission.  (*Id.* at 7–8.)

Anticipating the Trust's argument, Ocwen further argues that any reliance the Trust places on section 3.04 of the STA is misplaced.  (*Id.* at 8–13.)  First, Ocwen contends that section 3.04 of the STA contradicts the terms of the TSA.  The TSA, according to Ocwen, is an independent agreement addressing "transition services," including Records Management Storage, which is the subject of the RM SOW.  (*Id.* at 9.)  The RM SOW is a part of and governed by the TSA, which constitutes the entire agreement with respect to Records Management Storage.  (*Id.*)  Because section V.1 of the RM SOW specifically provides that "Ocwen shall, *at ResCap's cost*, direct the appropriate vendor to segregate, remove, repackage and relocate those records belonging to Ocwen," and the TSA expressly incorporates the RM SOW and contains enforceable merger and integration clauses, the Trust cannot argue that section 3.04 of the STA governs the parties' dispute.  (*Id.* at 9–10 (quoting RM SOW § V.1 (emphasis added)).)  Ocwen also argues that even if the STA and APA are grouped with the TSA and RM SOW to constitute the parties' entire agreement, nothing in section 3.04 of the STA is

inconsistent with or supersedes section V.1 of the RM SOW.  (*Id.*)  Both the STA and APA

address the "transfer" of the Servicing Files, but neither the STA nor the APA specifically

addresses the costs and expenses related to such transfer, particularly if Ocwen's and ResCap's

loan files are commingled.  (*Id.*)  If a direction to separate the files is given, someone has to be

responsible for segregating each party's files and paying to do so.  Ocwen contends that RM

SOW section V.1 deals with that specific issue; section 3.04 of the STA does not.  Second,

Ocwen argues that interpreting the parties' agreement such that the obligations under section

3.04 of the STA override the obligations under section V.1 of the RM SOW violates settled

principles of New York contract law by rendering section V.1 of the RM SOW superfluous and

without full force and effect.  (*Id.* at 11.)  Third, Ocwen asserts that section V.1 of the RM SOW

is more specific than the general language of section 3.04 of the STA and therefore the contract

interpretation doctrine of *ejusdem generis*, requiring that specific provisions control over general

provisions, dictates that section V.1 of the RM SOW prevails.  (*Id.* at 12–13.)

Ocwen concludes by arguing that it is not obligated to reimburse the Trust for the costs of

storing the Servicing Files or to pay any costs relating to the storage of Servicing Files that were

retained by the Trust (i.e., the commingled files).  (*Id.* at 13–14.)  According to Ocwen, it is not

liable for the costs and expenses relating to the storage of any of the Servicing Files, whether

they are being stored at Iron Mountain or Kenwood, as prescribed by the RM SOW.  (*Id.*)  As

such, Ocwen requests the detailed declaratory judgment outlined above.  (*Id.* at 14–15.)

### E.      The Defendant's Motion

The Trust's Motion requests that the Court grant summary judgment in the Trust's favor

and dismiss the Adversary Proceeding and Relevant Administrative Claim.  (Def.'s Motion at

16.)  According to the Trust, the STA, not the RM SOW, governs ResCap's loan transfer

obligations in connection with the servicing platform sale to Ocwen and, in turn, the parties'

dispute. (*Id.* at 10–11.) Under section 3.04 of the STA, the Trust asserts that (1) the transfer to

Ocwen of loan files stored with Iron Mountain (a vendor used by both ResCap and Ocwen at the

time the agreements were executed) is completed by informing Iron Mountain on whose account

the files should be held, and (2) the transfer of loan files stored with Kenwood (a vendor that

ResCap used, but Ocwen did not use at the time the agreements were executed) is completed by

Ocwen assuming ResCap's contract with Kenwood. (*Id.*) The Trust argues that the STA does

not require ResCap or the Trust to "physically segregate" the loan files or do anything other than

have them reflected by the Vendors as owned by Ocwen; thus, Ocwen does not have a claim

against the Trust relating to those loan files and summary judgment in the Trust's favor should

be granted. (*Id.* at 11.)

The Trust further argues that the RM SOW does not apply to the parties' dispute and, in

any event, conflicts with the STA, which is a later dated, more specific, and fully integrated

contract. (*Id.* at 11–16.) Even without the STA's merger clause and its more recent execution,

the Trust argues that the STA is more detailed in that it sets out precisely how the parties will

deal with the transfer of loan files in a variety of circumstances (two of which are relevant in this

case) and reflects a better understanding of the parties' agreement. (*Id.* at 12–13.) According to

the Trust, the RM SOW fails to identify which "records" it governs and does not distinguish

between the various types of "records" and how or where they are stored, whereas the STA

specifically governs the transfer of servicing and sets out how the transfer of loan files related to

the transfer of servicing rights would be completed. (*Id.*)

The Trust asserts that the RM SOW is a contract providing for services that Ocwen is

required to provide to ResCap, and not the other way around. (*Id.* at 13–14.) The Trust points to

section 14.1(d) of the TSA, which provides that ResCap, as the "Recipient," may terminate "any Service" provided under the parties' agreement upon written notice.[10]  (*Id.*)  According to the Trust, ResCap did not terminate the "service" of Segregation and Delivery of Ocwen's loan file because no such service exists; and the fact that a service could be terminated by ResCap (even if the Segregation and Delivery could be construed as a service) makes clear that Ocwen cannot force ResCap to receive (and then pay for) this "service."  (*Id.*)  The Trust also emphasizes the list of services ResCap is to provide to Ocwen under Schedule A-1 of the TSA.  (*Id.* at 14.)  The Trust asserts that only one service, "Records Management Storage," relates to records management in this list, and while it relates to storage costs incurred by ResCap, it does not indicate that ResCap is obligated to "pay directly" for the Segregation and Delivery of Ocwen's loan files.  (*Id.*)  The Trust further contends that if the parties intended for ResCap to bear the costs of Segregation and Delivery, the parties would have included the Segregation and Delivery as a service ResCap is required to provide to Ocwen.  (*Id.*)

---

[10]     Section 14.1 states in pertinent part:

> 14.1 Termination.  Without limiting the rights of the Parties under any other provision of this Agreement, this Agreement or any Service to be provided under this Agreement may be terminated as follows:
>
> . . .
>
>     (c) by either Party acting in its capacity as "Recipient" [of services under the Agreement], upon written notice to the other Party if, following a material breach by Supplier of this Agreement, the terminating Party sends to the other Party an initial notice of such material breach and the other Party fails to cure such material breach within 30 days of receipt of such initial notice; provided, however, that if cure cannot reasonably be accomplished within such 30-day period, neither this Agreement nor any Service may be terminated by reason of such breach for so long as the other Party commences a cure within such 30-day period and pursues such cure diligently to completion and such completion occurs within ninety (90) days of such written notice, provided that such termination will be only with respect to the Service(s) provided to such Party acting in its capacity as "Recipient" that are identified in the written notice; . . . .

(TSA § 14.1.)

According to the Trust, even if the RM SOW applied to the parties' dispute, Ocwen cannot claim that ResCap or the Trust is obligated to pay for the loan file Segregation and Delivery because Ocwen has not satisfied its own conditions precedent. (*Id.* at 14–16.) The Trust contends that, at best, section V.1 of the RM SOW obligates ResCap and the Trust to pay for a vendor to Segregate and Deliver the loan files that Ocwen directs the Vendor to do within 18 months of the Effective Date of the Plan. (*Id.* at 14.) The Trust argues that the Effective Date was February 15, 2013, which is more than 18 months ago, and Ocwen still has yet to direct any vendor, whether it be one of the Vendors or not, to Segregate and Deliver the files. (*Id.*) The Trust asserts that ResCap and the Trust are therefore not obligated to pay Ocwen anything claimed in the Relevant Administrative Claim or the Complaint. (*Id.* at 14–15.) The Trust further argues that Ocwen's request in August 2013 was insufficient to satisfy this condition precedent and solely related to the Trailing Documents stored at Iron Mountain; Ocwen has not directed the Vendors to do anything with the entire loan files. (*Id.* at 15.) The Trust argues that in addition to Ocwen's failure to meet this condition precedent within the 18-month period demonstrating the insufficiency of Ocwen's Relevant Administrative Claim and Complaint, it evidences the lack of sincerity in Ocwen's purported belief that ResCap owes Ocwen money under these circumstances. (*Id.* at 15–16.)

The Trust also argues that Ocwen's declaratory judgment claim should be dismissed because it is identical to its breach of contract claim. (*Id.* at 8–9 n.5.)

## II.    DISCUSSION

### A.    Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, states that "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056.  To successfully

assert that a fact is not in dispute or cannot be disputed, a movant must

> cit[e] to particular parts of materials in the record, including
> depositions, documents, electronically stored information,
> affidavits or declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory answers,
> or other materials; or show[] that the materials cited do not
> establish the absence or presence of a genuine dispute, or that an
> adverse party cannot produce admissible evidence to support the
> fact.

FED. R. CIV. P. 56(c)(1).  "The party seeking summary judgment bears the burden of establishing

that no genuine issue of material fact exists and that the undisputed facts establish [the movant's]

right to judgment as a matter of law."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61

(2d Cir. 1995); s*ee also McHale v. Boulder Capital LLC (In re 1031 Tax Grp., LLC)*, 439 B.R.

47, 58 (Bankr. S.D.N.Y. 2010).  The Court may also grant some but not all of the relief requested

in a summary judgment motion if it finds disputed issues of fact as to some of the issues

presented.  *See* FED. R. CIV. P. 56(g) ("If the court does not grant all the relief requested by the

motion, it may enter an order stating any material fact—including an item of damages or other

relief—that is not genuinely in dispute and treating the fact as established in the case."); *see also*

*Chevron Corp. v. Donziger*, No. 11 Civ. 0691(LAK), 2013 WL 4482691, at *2 n.17 (S.D.N.Y.

Aug. 22, 2013) (citing FED. R. CIV. P. 56(g)); *Pensioenfonds Metaal en Techniek v. Strategic*

*DSRG*, LLC, No. 09 Civ. 5644(RJS), 2011 WL 310327, at *7 (S.D.N.Y. Jan. 24, 2011) (denying

parties' motions for summary judgment, but entering order stating as a matter of law a material

fact that is not genuinely in dispute (citing FED. R. CIV. P. 56(g))); *D'Iorio v. Winebrow, Inc.*,

No. 12-cv-1205 (ADS)(ARL), --- F. Supp. 3d ---, 2014 WL 7335466, at *19 (E.D.N.Y. Dec. 26,

2014) (citing *Nat'l Union Fire Ins. Co. v. Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp.

2d 1047, 1051 (C.D. Cal. 2011) ("Rule 56(g) allows a court to grant partial summary judgment, thereby reducing the number of facts at issue in a trial." (citation omitted))).

> **B.      Section V.1 of the RM SOW Governs the Parties' Dispute**

The threshold issue of the parties' cross-motions is which contract provision governs their dispute regarding the Segregation and Delivery of the Servicing Files.[11]  Ocwen argues that section V.1 of the RM SOW controls and requires ResCap to bear the cost of the Segregation and Delivery (Plf.'s Motion at 6–11); the Trust asserts that section 3.04 of the STA controls and does not impose the cost of Segregation and Delivery upon ResCap (Def.'s Motion at 10–16).

Each of the parties' main arguments rests first on the notion that the parties' contracts should be read separately; the parties also, however, present alternative arguments based on the premise that the contracts are fully integrated and should be read together.  "Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously."  *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993) (citing cases); *see also Polner v. Monchik Realty Co.*, 9 Misc. 3d 755, 760–61 (N.Y. Sup. Ct. 2005) ("These two documents were executed at substantially the same time by the same parties, concern the same subject matter, and refer to each other.  Consequently, they were contemporaneous writings, forming part of the same transaction and their provisions must be read and interpreted together and harmonized.").  Documents that are executed at different times, however, may still be construed as a single agreement, absent provisions in the contracts evincing a contrary intention, "if 'the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken.'"  *Commander Oil Corp.*, 991 F.2d at 53 (quoting 6 WILLISTON ON CONTRACTS § 863, at 275 (3d

---

[11]      The parties do not dispute that New York law governs all of the parties' contracts.  The Court accordingly applies New York law in its analysis of the parties' agreements.

ed. 1970)).  Moreover, New York law recognizes that if the separate contracts refer to one another, or one incorporates the other by reference, the parties would be bound by the promises in each of the contracts.  *See Painewebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) ("Under New York law, 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'" (citation omitted)).

The Court finds and concludes that the parties' four contracts (the APA, STA, TSA, and RM SOW) are fully integrated and should be read and interpreted together.

To begin with, the four contracts all relate to the sale of ResCap's servicing platform and mortgage servicing rights to Ocwen.  The APA, as the parties agree, is the primary agreement governing the sale.  (SUF ¶ 11.)  The STA sets forth "the specific terms upon which the transfer of mortgage loan servicing and master servicing with respect to the Servicing Agreements shall be effected."  (STA Preamble.)  The TSA provides for the exchange of "certain transition services" between the parties that are to be rendered "in connection with the transactions contemplated by the APA" (TSA Preamble), and the RM SOW is meant "to detail the deliverables and/or services to be performed in accordance with the terms and conditions of the [TSA]" (RM SOW Preamble).

Moreover, the contracts refer to one another.  The APA specifically refers to the STA and TSA by:  (1) defining them as "Ancillary Agreements" (APA § 2.10); and (2) contemplating the future negotiation of the STA and TSA and their purposes (*id.* § 6.20 (stating that the parties will negotiate in good faith the TSA); *id.* § 9.1 (stating that the parties will negotiate in good faith the STA)).  The STA refers to the APA on multiple occasions, indicating that the STA is to be effected in accordance with the terms of the APA.  (*See, e.g.*, STA Preamble, §§ 2.01, 3.01, 3.04, 3.20, 5.03.)  The TSA similarly references the APA.  (*See, e.g.*, TSA Preamble, §§ 5.4, 8.1, 9.1.)

The TSA also specifically refers to the RM SOW, incorporating its terms by reference.  (*See id.*

Preamble, § 15.4, Sch. A-1, A-2.)  Further, the APA specifically states that the APA "together

with the Ancillary Agreements [i.e., the STA and TSA], constitutes the entire agreement between

the parties."  (APA § 12.4.)

The Trust places too much emphasis on the fact that the APA was executed first, the RM

SOW second, and the TSA and STA contemporaneously, but last.  (*See* Def.'s Motion at 12–13.)

The agreements together encompass the entire transaction of the sale from ResCap to Ocwen,

refer to one another, and should therefore be read together.  *See Commander Oil Corp.*, 991 F.2d

at 53.

The Trust also places too much emphasis on the fact that the STA contains a merger

clause stating that the STA "supersedes all prior agreements [i.e., the RM SOW] and

understandings (other than the APA) . . . ."[12]  (STA ¶ 5.03; *see also* Def.'s Motion at 12–13.)  In

doing so, the Trust ignores the similar merger clauses in the APA and TSA, which weaken the

Trust's argument.[13]  Although New York law "gives full effect to merger clauses" and

---

[12]     *See* STA § 5.03 ("This Agreement, including the Exhibits and Schedules hereto and the documents and
other writings referred to herein or therein or delivered pursuant hereto, together with the APA contains the entire
agreement and understanding of the Parties with respect to its subject matter.  There are no restrictions, agreements,
promises, warranties, covenants or undertakings between the Parties other than those expressly set forth herein or
therein.  This Agreement supersedes all prior agreements and understandings (other than the APA) among the
Parties, both written and oral, with respect to its subject matter.").

[13]     The APA states:

> This Agreement, together with the Ancillary Agreements, constitutes the entire
> agreement between the parties with respect to the subject matter hereof and
> supersedes all prior agreements and understandings, both oral and written,
> between the parties with respect to the subject matter hereof.

(APA § 12.4.)

The TSA states:

> This Agreement, including the Schedules hereto, which are each hereby
> incorporated herein and made a part hereof, contains the entire agreement
> between the Parties with respect to the subject matter hereof.  While purchase

extinguishes a previous agreement if the merger clause expressly states that the new (or later

dated) agreement supersedes the previous agreement, *Roberts v. Edith Roman Holdings*, No. 10

Civ. 4457 (LAP), 2011 WL 2078223, at *3 (S.D.N.Y. May 19, 2011), a merger clause may be

overcome when the contracts are executed by the same parties and for the same purpose and the

parties' intent would be "promote[d]" rather than "undermine[d]," *see VoiceAge Corp. v.

RealNetworks, Inc.*, 926 F. Supp. 2d 524, 530 (S.D.N.Y. 2013).  The parties' initial APA

indicates the parties' intent to incorporate all of the "Ancillary Agreements," which include the

TSA and STA, as part of the parties' "entire agreement."  (APA § 12.4.)  Further, the STA and

TSA expressly state that each of these agreements is to be effected in accordance with the terms

of the APA.  (*See, e.g.*, STA Preamble, §§ 2.01, 3.01, 3.04, 3.20, 5.03; TSA Preamble, §§ 5.4,

8.1, 9.1.)  Additionally, the STA, which the Trust attempts to carve out and away from the other

agreements, expressly provides that the APA should control over the terms of the STA if the two

agreements conflict—even though the STA was executed subsequently.  (STA § 2.01 ("In the

event of any conflict between the terms of this Agreement and the terms of the APA, the terms of

the APA shall control.").)  As such, the contracts should be read together as one single

agreement.

Turning now to the substance of the parties' agreement, the interpretation of a contract is

a question of law that may be properly decided on a motion for summary judgment, provided the

language of the contract at issue is clear, not ambiguous.  *See Painewebber Inc.*, 81 F.3d at 1199

("[W]here the intent of the parties can be determined from the face of the agreement,

---

orders, invoices or similar routine documents may be used to implement or
administer provisions of this Agreement, any provisions of such documents that
add to, vary, modify or are at conflict with the provisions of this Agreement will
be deemed deleted and will have no force or effect on either Party's rights or
obligations.

(TSA § 15.4.)

interpretation is a matter of law, and a claim turning on that interpretation may thus be determined by summary judgment or by dismissal." (citation and internal quotation marks omitted)); *Bank of N.Y. Mellon Tr. Co., Nat'l Assoc. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 641 (S.D.N.Y. 2012) ("Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.  Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." (citation and internal quotation marks omitted)); *Roberts*, 2011 WL 2078223, at *2 ("In a contract dispute, summary judgment is appropriate only if the language of the contract is unambiguous."); *In re Aerovias Nacionales de Colom., S.A. Aviance*, 323 B.R. 879, 887 (Bankr. S.D.N.Y. 2005) ("Whether a contract is clear or ambiguous is to be decided by the court as a matter of law, and the Court determines that it can make this finding on the present record."); *U.S. Bank Tr. Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 289 (Bankr. S.D.N.Y. 2013) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts . . . ." (citation and internal quotation marks omitted)).  "Contract language is not ambiguous if it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Bank of N.Y. Mellon Tr.*, 910 F. Supp. 2d at 642 (citation and internal quotation marks omitted).  By contrast, contract language is ambiguous "if it is reasonably susceptible to more than one meaning." *Id.* (citation omitted); *see also Commander Oil Corp.*, 991 F.2d at 51–52 ("We have described such an ambiguity as the absence of a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." (citation and internal quotation marks omitted)).

Under New York law, a court interpreting a contract "is required to discern the intent of the parties, to the extent that the parties memorialized what they intended, by what they wrote."

*In re Aerovias Nacionales de Colom.*, 323 B.R. at 887 (citation and internal quotation marks

omitted). When the language of the contract is clear, "the intent of the parties must be gleaned

from within the four corners of the instruments, and not from extrinsic evidence," *id.* (citation

and internal quotation marks omitted), and the contract "must be enforced according to the plain

meaning of its terms," *Fitzpatrick v. Animal Care Hosp., PLLC*, 104 A.D.3d 1078, 1080 (N.Y.

App. Div. 2013) (citation and internal quotations omitted). It is also crucial that the contract "be

read to give effect to all its provisions and to render them consistent with each other." *In re*

*Aerovia Nacionales de Colom.*, 323 B.R. at 888; *see also Painewebber Inc.*, 81 F.2d at 1199

("New York follows the common law rule that, [i]n interpreting a contract, the intent of the

parties governs, and therefore [a] contract should be construed so as to give full meaning and

effect to all of its provisions." (citation and internal quotation marks omitted)); *Bank of N.Y.*

*Mellon Tr.*, 910 F. Supp. 2d at 648–49 ("In interpreting a contract under New York law, words

and phrases . . . should be given their plain meaning, and the contract should be construed so as

to give full meaning and effect to all of its provisions. [A]n interpretation of a contract that has

the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will

be avoided if possible." (citations and internal quotation marks omitted)); *Muzak Corp. v. Hotel*

*Taft Corp.*, 1 N.Y.2d 42, 47 (1956) ("The rules of construction of contracts require us to adopt an

interpretation which gives meaning to every provision of a contract or, in the negative, no

provision of a contract should be left without force and effect."); *Givati v. Air Techniques, Inc.*,

104 A.D.3d 644, 646 (N.Y. App. Div. 2013) ("[A] court should seek an interpretation which

fulfills the parties' reasonable expectations and which gives all parts of the contract full force

and effect."). Moreover, "specific terms in a contract will override the general," including when

the specific and general provisions appear to conflict. *Baeshen v. Arcapita Bank B.S.C.(c) (In re*

*Arcapita Bank B.S.C.(c))*, 520 B.R. 15, 26 (Bankr. S.D.N.Y. 2014) (citations omitted); *Muzak Corp.*, 1 N.Y.2d at 47 ("Even if there was an inconsistency between a specific provision and a general provision of a contract (we find none), the specific provision controls."); *see also Isaacs v. Westchester Wood Works, Inc.*, 278 A.D.2d 184, 185 (N.Y. App. Div. 2000) ("Moreover, the *ejusdem generis* principle of contract interpretation here gives precedence to the specific clause for arbitration rather than the general clause for the exclusive jurisdiction of the courts . . . .").

Interpreting the parties' four contracts together, the Court finds and concludes that the contract language is sufficiently clear to hold, as a matter of law, that section V.1 of the RM SOW governs the parties' dispute regarding who bears the cost of the Segregation and Delivery of the Servicing Files.

*First*, looking at the plain meaning of the terms of section V.1 of the RM SOW and section 3.04 of the STA, section V.1 more specifically addresses Segregation and Delivery costs and therefore trumps section 3.04's more general terms. The RM SOW "sets forth each Party's responsibilities with respect to Records Management Services to be provided by Ocwen as Supplier, to or on behalf of the Recipients," which includes the "manag[ing of] vendors who support outsourcing of scanning, storage and delivery of the note, mortgage title policy, assignments and modification agreements in connection with Records Services." (RM SOW §§ I, I.F; *see also id.* § II.C (stating that the RM SOW also applies to "[m]anagement of physical and electronic document storage, retention, and destruction," as it relates to records services).) Consistent with this purpose, Schedule A-1 to the TSA indicates that the "Records Management Storage," to the extent ResCap owes the service to Ocwen (*compare id.* Sch. A-1, *with id.* Sch.

A-2), "represent[s] storage costs reimbursement related to the" RM SOW (*id.* Sch. A-1).[14]

Further in accordance with the purpose of the parties' agreement, section V.1 specifically states:

> Within 18 months after the Effective Date, Ocwen shall, at ResCap's cost, direct the appropriate third-party vendor to segregate, remove, repackage and relocate those records belonging to Ocwen from all other records at such record retention site.

(*Id.* § V.1.) This language is clear and unambiguous and imposes the costs of Segregation and

Delivery, which is inherently related to "Records Management Storage," on ResCap.

By contrast, the STA, to which the Trust points and concedes, merely "provides for the

transfer of mortgage loan servicing and master servicing under the Servicing Agreements from

[ResCap] to [Ocwen] . . . ." (STA § 2.01; *see also* Def.'s Motion at 10.) The STA's reference to

the "transfer" of loan servicing from ResCap to Ocwen is not as specific as the "Records

Management Storage," nor the Segregation and Delivery, addressed by the RM SOW. The Trust

hones in on the following two excerpts of section 3.04, arguing that this language governs the

parties' dispute:

> To the extent such Servicing Loan Files are physically located with a vendor utilized by both Sellers and Purchaser [i.e. Iron Mountain], transfer of possession of the Servicing Loan Files will be effected by the vendor reflecting its possession of such files for the account of Purchaser on its records.
>
> [¶] To the extent such Servicing Loan Files are physically located with a vendor of Sellers not utilized by Purchaser as of the Servicing Transfer Date [i.e. Kenwood], transfer of possession of the Servicing Loan Files will be effected by (i) Purchaser's accession to a contractual relationship with the vendor as a result of Purchaser's assumption of Sellers' agreement(s) with the vendor pursuant to the APA, (ii) Purchaser's entering into a separate

---

[14]    The Trust's argument that the RM SOW only contemplates services to be rendered by Ocwen to or on behalf of ResCap is unpersuasive. While the RM SOW's preamble does indicate that the services are to be rendered by Ocwen, the rest of the RM SOW in conjunction with the TSA and its Schedules clearly contemplate obligations on the part of each of the parties. Furthermore, section V.1 provides that "Ocwen shall . . . direct . . ."; thus Ocwen, as "supplier," was required to direct the vendor to segregate, etc., the files. (*See* RM SOW § V.1.) That section provides that the "recipient," ResCap or the Trust, was to pay for the services.

> agreement with the vendor, to the extent that Purchaser is
> assuming such contract or entering into such separate agreement,
> or (ii) Sellers' contractual granting of access to any constructive
> possession by Purchaser of such Servicing Loan Files.

(*Id.* § 3.04.)  The Trust asserts that for those records stored with Iron Mountain, the "transfer of

possession" of the Servicing Files was to be "effected by the vendor" and therefore the costs

should not be read to be borne by ResCap.  (Def.'s Motion at 11.)  The Trust similarly argues

that for those records stored with Kenwood, the "transfer of possession" of the Servicing Files

took place through Ocwen's assumption of ResCap's contract with Kenwood, again meaning

that any associated costs would not be borne by ResCap.  (*Id.*)  These arguments are

unpersuasive.

That the transfer of possession of the Servicing Files was to be effected by a vendor

and/or through the assumption of a contract says nothing about who bears the costs thereafter

relating to the continued storage and potential future Segregation and Delivery of the Servicing

Files.  A purchaser of servicing rights may well be satisfied leaving its files in storage with a

vendor.  Ocwen and ResCap both stored loan files at Iron Mountain before Ocwen's purchase of

ResCap's loan servicing platform and servicing rights.  Nothing in any of the agreements

between the parties required Ocwen to seek to move the files; nothing required that they be kept

at Iron Mountain.  Rather, the RM SOW gave Ocwen 18 months to direct a vendor to Segregate

and Deliver the Servicing Files at ResCap's expense.[15]  The Trust's argument erroneously

equates the transfer of "possession" of the Servicing Files, with the later management of such

"possession."  Of course, Ocwen had to have possession of the loan Servicing Files—wherever

---

[15]     Within that time frame, Ocwen directed Iron Mountain to do so with respect to the so-called Trailing
Documents; the Trust thereafter "'formally requested' that Iron Mountain immediately stop any work . . . under the
Iron Mountain SOW."  (SUF ¶¶ 20, 21.)

they were stored—if Ocwen was going to service the loans.[16]  Ocwen bought and paid for the

servicing rights; the prompt "transfer of possession" gave Ocwen the unquestioned right to

access the Servicing Files for the going concern business it paid billions of dollars to acquire.

Moreover, section 3.04 of the STA is silent (not inconsistent) about whether Ocwen can

direct a vendor to Segregate and Deliver the Servicing Files, and more importantly, who pays for

those services if a timely direction is given.  (STA § 3.04.)  Section V.1 of the RM SOW

addresses those issues.  (RM SOW § V.1.)  To the extent the Trust relies on the STA's cross-

references to provisions in the APA governing certain costs, the costs relevant to those APA

provisions do not relate to the storage or Segregation and Delivery costs contemplated

specifically in the RM SOW.  For example, the STA states in section 3.02:

> Except as otherwise provided herein, the costs and expenses of
> transferring the Purchased Mortgage Servicing to [Ocwen] shall be
> allocated among, and borne by, the Parties in accordance with
> Sections 9.2, 6.24 and 6.25 of the APA.

(*Id.* § 3.20.)  Section 9.2 of the APA provides that ResCap, "on the one hand, and [Ocwen], on

the other hand, shall each be responsible for 50% of all costs and expenses of transferring the

Purchased Mortgage Servicing to Purchaser" and then provides a non-exhaustive list of such

"costs and expenses," none of which relate to storage or the Segregation and Delivery.  (APA

§ 9.2.)  Section 6.24 of the APA addresses the preparation, to be done "[p]rior to Closing," "for

the potential transfer" of "[c]ertain Purchased Mortgage Servicing," which should be complete

on the "Closing Date or as soon thereafter as reasonably possible."  (*Id.* § 6.24.)  This section

---

[16]      "Possession" of loan files is potentially important to the loan servicer and borrowers.  For example,
possession of a promissory note endorsed in blank is generally sufficient to provide a loan servicer with standing to
foreclose.  *See In re Idicula*, 484 B.R. 284, 288 (Bankr. S.D.N.Y. 2013).  "Possession" of the loan servicing files is
also important for borrowers engaged in litigation with the loan servicer.  *See In re Lozano*, 392 B.R. 48 (Bankr.
S.D.N.Y. 2008).

further states that "any third party fees, costs and expenses incurred by [Ocwen] shall be paid by

[ResCap] . . . ."  (*Id.*)  Section 6.25 provides for the "Purchaser Payment Cap" indicating that

> the aggregate amount that [Ocwen] shall be liable for under the
> Purchaser Payable Cure Amount, the Transfer Taxes under <u>Section
> 6.9</u>, the transfer costs under <u>Section 9.2 (except to the extent paid
> for by [Ocwen] pursuant to section 6.24)</u> and any other Section
> specifically referencing the Purchaser Payable Cure Amount shall
> not aggregate exceed $10,000,000 . . . .

(*Id.* § 6.25 (emphasis in original).)  Not one of these provisions discusses the storage or

Segregation and Delivery of the Servicing Files.

Second, holding that section V.1 of the RM SOW governs this dispute prevents another

provision within the parties' agreement from being rendered superfluous or meaningless; each

provision, including section 3.04 of the STA, retains its "full force and effect."  *Givati*, 104

A.D.3d at 646.  If section 3.04 were to govern this dispute, the Trust concedes that it would

necessarily render section V.1 of the RM SOW meaningless.  More specifically, if section 3.04

governs Segregation and Delivery, the express terms of section V.1 of the RM SOW could not

co-exist and impose the costs upon ResCap—section V.1 would be lost.[17]  By contrast, with

section V.1 of the RM SOW in control of the parties' dispute, section V.1 governs Segregation

and Delivery costs, while the more general section 3.04 of the STA and the provisions of the

APA emphasized by the Trust still govern the "transfer of possession" and its related costs.

Third, the effect of section V.1 of the RM SOW is not inconsistent, but rather

"harmonious" with section 3.04.  *See In re AMR Corp.*, 485 B.R. at 303 ("New York law

provides that a court should construe a contract in a way that reasonably harmonizes its

provisions and avoids inconsistencies." (citations omitted)); *see also Kinek v. Paramount*

---

[17]    The Trust argues that the merger clause of the STA extinguishes the RM SOW as the STA was executed later, but as discussed above, the agreements should be considered fully integrated making the Trust's argument on this score inapplicable.  (*See* Def.'s Motion at 11.)

*Commc'ns*, 22 F.3d 503, 509 (2d Cir. 1994) ("The defendants' attempt to read sections 3.1 and

10.2 in isolation is, however, inconsistent with well established principles of contract

construction, which require that all provisions of a contract be read together as a harmonious

whole, if possible.").  For example, the different timing proposed for rendering the services

contemplated in section V.1 versus section 3.04 demonstrates that the provisions harmoniously

coexist.  On the one hand, the services contemplated in the RM SOW are to be rendered after the

closing/effective date and/or consummation of the parties' asset sale transaction.  (*See* RM SOW

§ V.1 (Segregation and Delivery to be performed "within 18 months after the Effective Date");

*see also* TSA Preamble (services under the statements of work incorporated by reference into the

TSA are to be rendered "from and after the Closing" "in connection with the transactions

contemplated by the APA"); *id.* § 3.1(a) (services listed in Schedules A-1 and A-2 to the TSA

are to begin "on the Effective Date"); *id.* Sch. A-1 ("Records Management Storage" services

under the RM SOW to be performed by ResCap to Ocwen have an estimated termination date of

August 31, 2014); *id.* Sch. A-2 ("Records Management" services under the RM SOW to be

performed by Ocwen to ResCap have an estimated termination date of February 15, 2016).  On

the other hand, the services contemplated in section 3.04 and elsewhere in the STA are to be

rendered prior to, on, or as shortly after the "Closing Date" of the parties' asset sale transaction

as possible.  (*See, e.g.*, STA § 3.04 (the initial transfer of the Servicing Files is to be performed

"[o]n or prior to each Servicing Transfer Date"); *id.* § 6.24 (addressing the preparation, to be

done "[p]rior to Closing," "for the potential transfer" of "[c]ertain Purchased Mortgage

Servicing," which should be complete on the "Closing Date or as soon thereafter as reasonably

possible.").  Thus, the STA involves services relating to the "transfer" of the Servicing Files that

are to be performed at or around the time of the actual transfer, whereas the RM SOW involves

"Records Management" and "Records Management Storage" services that are to be performed for a period of time after the transfer.

As a result of the Court's holding that section V.1 of the RM SOW governs the parties' dispute, the Court partially **GRANTS** the Plaintiff's Motion and **DENIES** the Defendant's Motion.

### C.       The Alleged Condition Precedent

Covering its bases, the Trust argues that should the Court find, as it does, that section V.1 of the RM SOW controls the dispute, Ocwen has failed to satisfy a condition precedent within section V.1 and is ultimately precluded from prevailing.  (Def.'s Motion at 14–15.)  According to the Trust, before ResCap can be liable for the Segregation and Delivery costs, Ocwen must first "direct" a vendor to Segregate and Deliver the Servicing Files and such "direct[ive] had to have been made within 18 months after the Effective Date" of the parties' transaction, or February 15, 2013.  (*Id.*; RM SOW § V.1.)  The Trust further asserts that Ocwen has failed to meet this condition precedent because:  (1) the August 2013 Iron Mountain SOW only constitutes a "request" that cannot be characterized as a "direct[ive];" and (2) even if it is a "direct[ive]," (a) the Iron Mountain SOW only contemplates "preparation" for the Segregation and Delivery, not the actual Segregation and Delivery, and/or (b) the Iron Mountain SOW only involves Trailing Documents, which are partial Servicing Files, rather than the whole Servicing Files, and cannot be the subject of Ocwen's purported "direct[ive.]"  (Def.'s Motion at 14–15.)

Ocwen argues that should the Court find a condition precedent exists, the August 2013 communications were a sufficient "direct[ive]" satisfying the purported condition precedent.  (Plf.'s Opp. at 6–7.)  Ocwen further argues that it was unable to fully pursue that "direct[ive]" because ResCap frustrated the "direct[ive]" via the stop work order.  (*Id.* at 6–8.)  As a result of

such frustration, Ocwen argues that the Trust cannot rely upon the allegedly unsatisfied condition precedent.  (*Id.*)

Under New York law, "it must clearly appear from the agreement itself that the parties intended a provision to operate as a condition precedent." *Kass v. Kass*, 235 A.D. 2d 150, 159 (N.Y. App. Div. 1997).  The New York Court of Appeals has recognized that "the use of terms such as 'if,' 'unless' and 'until' constitutes 'unmistakable language of condition.'" *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (citation omitted).  No such language was drafted into section V.1 to clearly evince the parties' intent to impose a condition precedent. In any event, the Court does not reach the issue whether section V.1 of the RM SOW clearly sets forth a condition precedent under New York law.  The Court need not reach this issue for two reasons.

*First*, as to the $7 million-worth of Segregation and Delivery costs attributable to the Iron Mountain SOW for the Trailing Documents, the application of the purported condition precedent would be inappropriate.  The undisputed facts before the Court demonstrate that Ocwen requested Iron Mountain to Segregate and Deliver the Trailing Documents in August 2013 within the 18-month time period prescribed in section V.1 of the RMW SOW, and that this request was never fully performed because ResCap ordered Iron Mountain to stop work. ResCap's stop work order is indisputably a breach of its obligations under section V.1 of the RM SOW.  Whether or not the purported condition precedent exists in section V.1, the Trust cannot now rely upon Ocwen's alleged failure to satisfy the alleged condition precedent when ResCap admittedly frustrated Ocwen's attempt at its satisfaction through ResCap's breach.  *Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of the City of N.Y.*, 28 N.Y.2d 101, 106 (1971) ("[A] party to a contract cannot rely on the failure of another to perform a condition precedent where

he has frustrated or prevented the occurrence of the condition."); *see also MHR Capital Partners LP*, 12 N.Y.3d at 646.

*Second*, as to the Segregation and Delivery costs for any other Servicing Files Ocwen acquired that are being or have been stored at third-party vendors, including the Vendors, there are disputed issues of fact precluding the Court from granting summary judgment to either party with respect to the condition precedent issue. The record before the Court does not clearly establish whether ResCap's breach of section V.1 was material or constituted a repudiation such that Ocwen would be excused from directing further Segregation and Delivery of Servicing Files, other than the Trailing Documents subject to the Iron Mountain SOW, within the 18-month period. Under New York law, "[w]hen a party has breached a contract, that breach may excuse the nonbreaching party from further performance if the breach is 'material.'" *New Windsor Volunteer Ambulance Corps, Inc.*, 442 F.3d 101, 117 (2d Cir. 2006). A breach is "material" if it goes "to the root of the agreement between the parties." *Id.* at 117 (citation and internal quotation marks omitted). The question of materiality, although it may be appropriately decided as a matter of law in certain circumstances, is more commonly considered a mixed question of law and fact, or primarily a question of fact, "consistent with the 'wavering and blurred' line that divides the material breach from the trivial." *Bear, Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 296 (S.D.N.Y. 2005) (quoting *Jacob & Youngs v. Kent*, 230 N.Y. 239 (1921)). Thus, the materiality of a party's breach "is not properly disposed of by summary judgment." *Id.* at 295–96 (collecting cases) (denying summary judgment because genuine issue of material fact concerning whether party's alleged breach was material existed). Similarly, "[t]he doctrine [of anticipatory breach] relieves the nonrepudiating party's breach of its obligation of future performance and entitles that party to recover the present value of its

damages from the repudiating party's breach of the total contract." *About.com, Inc. v. TargetFirst, Inc.*, No. 01 CV 1665(GBD), 2003 WL 942134, at *4 (S.D.N.Y. Mar. 10, 2013) (quoting *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (1989); *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1988)). "[A]n anticipatory breach may occur where 'the other party has attempted to avoid its obligations by advancing an "untenable" interpretation of the contract, or has communicated its intent to perform only upon the satisfaction of extracontractual conditions.'" *Id.* (quoting *SPI Commc'ns v. WTZA-TV Assoc. Ltd. P'ship*, 229 A.D.2d 644, 645 (N.Y. App. Div. 1996)). A repudiating party's intent not to perform must be announced in a "positive and unequivocal manner." *Id.* (quoting *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978)). Where a genuine issue of fact exists as to whether a party committed an anticipatory breach of contract, summary judgment is unwarranted. *See id.* at 4–5 (denying summary judgment because genuine issue of material fact as to whether party committed an anticipatory breach of the parties' contract existed). The parties' failure to establish the nature of the underlying breach precludes this Court from granting summary judgment as to the breach. In light of these disputed issues of fact, it is unnecessary for the Court at this time to reach the issue whether a condition precedent was satisfied and later frustrated.[18]

---

[18]     The summary judgment record is unclear whether Ocwen directed vendors other than Iron Mountain to Segregate and Deliver loan files (other than the Trailing Documents), and, if so, which files. The October 14, 2013 letter from Ocwen to ResCap, states, in part, as follows:

> Although we agree that Ocwen is the party that must facilitate the third-party vendor's file segregation and removal process, which Ocwen has done, we disagree with ResCap's suggestion that Ocwen should bear the costs . . . .

(SUF ¶ 22 & Ex. G.) The Court has not been provided with evidence that Ocwen directed vendors to segregate and deliver other files.

Although Ocwen attempts to demonstrate that it was excused from making future directives because the Trust alleges that if Ocwen ever made a "direct[ive]" pursuant to section V.1, ResCap or the Trust "would have" frustrated it by preventing the vendor from going forward with the Segregation and Delivery (*see* Def.'s Motion at

The Defendant's Motion is therefore **DENIED** with respect to the condition precedent issue.

### D.    Ocwen's Obligations to Reimburse ResCap[19]

In addition to arguing that section V.1 of the RM SOW governs the parties' dispute, Ocwen moves for summary judgment declaring as a matter of law that Ocwen is not obligated to reimburse ResCap (or the Trust) for the costs of storing the Servicing Files or pay any costs related to the storage of servicing files retained by ResCap since September 2013, when ResCap's formal request to cease Iron Mountain's Segregation and Delivery of the Trailing Documents went into effect.  (Plf.'s Motion at 13–14.)  Ocwen alleges that to the extent ResCap is liable for the costs of Segregation and Delivery under section V.1, Ocwen should be entitled to a declaration that it is not obligated to reimburse ResCap for any charges paid to Iron Mountain after September 2013 related to storage of the Servicing Files acquired by Ocwen.  (*Id.*)  Ocwen further alleges that it is entitled to a declaration that ResCap is obligated to reimburse Ocwen for any storage charges Ocwen has paid to Kenwood since September 2013 for the storage of servicing files retained by ResCap.  (*Id.*)

The Trust argues that no such declaration should be made and that to the extent the Plaintiff's Motion is premised on charges by Kenwood, the Complaint fails to sufficiently state a

---

14–15), the speculation of what ResCap or the Trust "would have" or "would not have done" in response to Ocwen hypothetically making other directives to vendors is hardly sufficient to support summary judgment.

[19]    The Court's holding in this section of the Opinion is only applicable to the Adversary Proceeding, not to the Relevant Administrative Claim.  The Relevant Administrative Claim only seeks recovery of Segregation and Delivery costs that should have been performed pursuant to the Iron Mountain SOW and further estimated costs for Segregation and Delivery to be performed by Iron Mountain.  (*See generally* Relevant Administrative Claim.)

claim as to such charges and granting summary judgment on that score would therefore be inappropriate.[20]  (Plf.'s Opp. at 17–18.)

The RM SOW clearly contemplates the fact that the Servicing Files acquired by Ocwen are, in at least some vendor situations, commingled with servicing files retained by ResCap.  (*See* RM SOW § VII.A.4.c ("Since individual invoices from vendors cannot segregate work performed just for ResCap . . . ."); *id.* § VI.A.2 (referencing storage costs as they "relate to non-ResCap files."); *id.* § V.1 (addressing the segregation of "records belonging to Ocwen from all other records at such record retention site").  The contract also clearly sets forth that "Ocwen will pay to ResCap any file storage costs incurred by ResCap that relate to non-ResCap files."  (*Id.* § VI.A.2.)  Similarly, the TSA's Schedules set forth that Ocwen owes ResCap for an estimated $172,190 in third-party costs relating to "Records Management" on a variable monthly basis.  (*See* TSA Schs. A-2, C-2.)  Thus, Ocwen is not entitled to summary judgment declaring that Ocwen need not reimburse ResCap for any storage costs relating to the Servicing Files Ocwen acquired and the Plaintiff's Motion to that effect is **DENIED**.

As to the Kenwood servicing files ResCap and AFI retained, the RM SOW provides that ResCap, not Ocwen, should bear the costs of such storage.  Section VII.A.4.c states:

> Since individual invoices from vendors cannot segregate work performed just for ResCap, [Ocwen] will submit sufficient documentation justifying ResCap's portion of any such invoices. . . .

(*Id.* § VII.A.4.c.)  Also, in the TSA's Schedules, the parties expressly provided that ResCap would be liable to Ocwen for certain "Records Management Storage" related costs.  (*See* TSA Schs. A-1, C-1.)  Such costs included an estimated $110,234 in third-party costs per month to be

---

[20]    The Court finds that Ocwen's Complaint refers sufficiently to Kenwood and Iron Mountain together as "Vendors," satisfying Federal Rule of Civil Procedure 8 such that the costs charged by Kenwood should be read to be included in the Complaint's request for relief.  But the Statement of Undisputed Facts does not provide an undisputed factual basis to grant Ocwen summary judgment relief relating to files stored at Kenwood.

subject to "monthly variable billing methodology." (*Id.* Sch. C-1.) Thus, to the extent Ocwen is able to provide sufficient documentation evidencing that portions of the monthly invoices from Kenwood are for costs incurred to store servicing files that ResCap and/or AFI retained, the RM SOW and TSA require ResCap to reimburse Ocwen for such costs. Accordingly, the Plaintiff's Motion is **GRANTED** in part.

### E.     Damages

Having resolved some of the matters raised in the parties' Motions, the primary outstanding issue is damages. Under New York law, breach of contract damages may fall into any one of three categories: expectation, reliance, and restitution. *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 424–25 (S.D.N.Y. 2004) (citing *Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, No. 02 Civ. 9149, 2004 WL 435058, at *8 (S.D.N.Y. Mar. 9, 2004) (citation omitted)). Regardless of the damages sought, the plaintiff bears the burden of proof of establishing that "any claimed damages were caused by defendant's breach to a reasonable degree of certainty." *Id.* (quoting *Xpedior Creditor Tr.*, 2004 WL 435058, at *8 (internal quotation marks and citation omitted)). Ocwen appears to request expectation and/or reliance damages in its Complaint. (*See* Compl. at 7–8.) Generally, "the normal measures of damages for breach of contract is expectation damages . . . ." *McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*, 1990 WL 138959, at *8 (S.D.N.Y. Sept. 19, 1990) (citing *Kenford Co. v. Cty. of Erie*, 67 N.Y.2d 257, 260 (1986); *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 513 (2d Cir. 1989); *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir. 1989)). Expectation damages "offer the broadest remedy" and constitute "'the amount necessary to put plaintiff in as good a position as if defendant had fulfilled the contract.'" *Wechsler*, 330 F. Supp. 2d at 425 (quoting *Saxton Commc'n Grp., Ltd. v. Valasses Inserts, Inc.*, No. 93 Civ. 0388, 1995 WL

679256, at *2 (S.D.N.Y. Nov. 15, 1995) (citing *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720,

728 (2d Cir. 1992)). Reliance damages "seek to restore the injured party to the position [he or

she] was in before the contract was formed" and "allow for recovery of 'expenditures [the

injured party] made in reliance on defendant's representations and that [he or she] otherwise

would not have made." *World of Boxing LLC v. King*, --- F. Supp. 3d ---, 2015 WL 427225, at

*2 (S.D.N.Y. Feb. 2, 2015) (citations omitted). "[W]hen expectation damages defy precise

calculation, reliance damages are the appropriate remedy." *Id.* (citation omitted).

At this stage of the case, Ocwen has not met its burden of proving damages and impliedly

admits in its motion that the present record before the Court is insufficient to establish damages

by way of its request that the Court order limited discovery and an accounting. (Plf.'s Motion at

13–14.) Because the issue of damages is not ripe for summary judgment, the Court does not at

this time resolve what damages may be owing. Moreover, it is unclear on the present record

whether an accounting is an available remedy. *See Berk v. Tradewell, Inc.*, No. 01 Civ.

9035(MBM), 01 Civ. 10068(MBM), 2003 WL 21664679, at *7 (S.D.N.Y. July 16, 2003) ("A

party that sues for an accounting must establish four elements: '(1) relations of a mutual and

confidential nature; (2) money or property entrusted to the defendant imposing upon him a

burden of accounting; (3) that there is not adequate legal remedy; and (4) in some cases, a

demand for an accounting and a refusal.'" (quoting *Pressman v. Estate of Steinvorth*, 860 F.

Supp. 171, 179 (S.D.N.Y. 1994)) (holding plaintiff failed to establish third element to obtain an

accounting because "[a] breach of contract suit for damages provides an adequate legal remedy"

and "normal discovery procedures" could be employed (citing *Arnold Prods., Inc. v. Favorite

Films Corp.*, 298 F.2d 540, 542–43 (2d Cir. 1962) (accounting unnecessary because plaintiff

could discover "by means of familiar discovery devices" any information it needed to establish damages, but not reversing the district court because defendant had not objected))).

It may well be that with the benefit of this Opinion, the parties will be able to resolve their remaining issues.  This Opinion applies to both the Adversary Proceeding and the Relevant Administrative Claim, but each of the Court's holdings is not necessarily applicable to both.  The Relevant Administrative Claim only seeks recovery of Segregation and Delivery costs attributable to the failed Iron Mountain SOW and further Iron Mountain Segregation and Delivery costs.  The Adversary Proceeding seeks recovery of the same Iron Mountain Segregation and Delivery costs, but also seeks recovery of Iron Mountain and Kenwood storage costs incurred since September 2013.

Counsel should promptly meet and confer about discovery that may be needed if this case goes forward.  Counsel shall also schedule a case management conference for an upcoming omnibus hearing date in the chapter 11 proceedings.

### III.        <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part the Plaintiff's Motion, and **DENIES** the Defendant's Motion in its entirety.

**IT IS SO ORDERED.**

Dated:  July 14, 2015
   New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge